## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NATALIE BARBICH and BRUCE LINDVALL, individually and as the representative of a class of similarly situated persons, and on behalf of the Northwestern University Employee Welfare Plan, | Case No.   25-cv-6849 |
| | **COMPLAINT** |
| Plaintiffs, | **CLASS ACTION** |
| v. | |
| | **JURY TRIAL** |
| Northwestern University, Northwestern University Executive Director, Benefits & Work/Life Resources, and Does 1-20, | **DEMANDED** |
| Defendants. | |

## <u>NATURE OF THE ACTION</u>

1.     Plaintiffs Natalie Barbich and Bruce Lindvall ("Plaintiffs"), as representatives of the class defined herein, and on behalf of the Northwestern University Employee Welfare Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act ("ERISA") against Northwestern University, Northwestern University Executive Director, Benefits & Work/Life Resources, and Does 1-20 (together, "Defendants"). As described herein, Defendants have breached their fiduciary duties under ERISA by (1) failing to prudently select and monitor the Plan's preferred provider organization ("PPO") medical insurance options, allowing the low-deductible option to be financially dominated by the high-deductible option; and (2) failing to disclose this material information to the Plan's participants. Defendants' actions and omissions have caused millions of dollars in losses to the proposed class. Plaintiffs bring this action to recover these losses, prevent further similar conduct, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      As of 2023, 53.7% of civilian Americans relied upon their employer or union for health insurance coverage.[1] This employment-based coverage is by far the most common type of health insurance coverage in the United States,[2] and along with retirement benefits, make up 13% of total national compensation.[3] Americans also devote a substantial percentage of their annual expenditures to healthcare. In 2023, healthcare accounted for 8% of all consumer expenditures.[4] As such, it is crucial that each health insurance option offered by employers provides unique advantages to participants without needlessly wasting their money.

3.      To this end, employers must confirm that no health insurance option is financially dominated by another. In economic terms, an option is dominated when it provides the same financial value to a consumer yet costs more than an alternative. A health insurance option is financially dominated when there is another option that results in lower total out-of-pocket expenses to participants, inclusive of premiums and regardless of the amount of medical care received.[5] In essence, the dominated option costs more but provides no additional benefit.

4.      In managing the Plan, Defendants have assembled PPO options in which the low-deductible option is financially dominated by the higher-deductible options, in breach of their fiduciary duty of prudence. In addition, Defendants are aware of the dominated nature of the low-

---

[1] https://www2.census.gov/library/publications/2024/demo/p60-284.pdf.
[2] *Id.*
[3] Monahan, Amy and Richman, Barak D., Hiding in Plain Sight: ERISA's Cure for the $1.4 Trillion Health Benefits Market (2025). Yale Journal on Regulation, Volume 42, No.1, Pp. 234-290, at 237 n.1; see also at 263-264 (the full cost of employer sponsored health insurance is a compensation expense that reduces wages accordingly).
[4] https://www.bls.gov/news.release/pdf/cesan.pdf.
[5] *See* Choose to Lose: Health Plan Choices from Menu with Dominated Options, at 1321.

deductible option but have failed to communicate this material information to the Plan's participants, in breach of their fiduciary duty.

5. To purportedly accommodate the varying needs of their employees, Defendants offer high-deductible ("Value PPO"), mid-deductible ("Select PPO"), and low-deductible ("Premier PPO") options. These options vary in features such as monthly premiums, deductibles, coinsurance, and out-of-pocket maximums. The Premier PPO option is accompanied by higher premiums in exchange for a lower annual deductible, while the Select and Value PPO options offer lower premiums but higher annual deductibles.

6. Defendants inform the participants that if they choose an option with lower monthly premiums (and higher deductibles), they will likely pay more in out-of-pocket costs—through copayments, coinsurance, deductibles, and the like—than they would if they choose an option with higher monthly premiums (and lower deductibles). But this is false. The high-deductible Value PPO option provides lower out-of-pocket expenses *for all levels of medical spending*, meaning the high-deductible Value PPO option financially dominates the low-deductible Premier PPO option.

7. Defendants' management of the Plan's PPO options is subject to ERISA's strict fiduciary duties. 29 U.S.C. § 1104(a)(1). These duties are "the highest known to the law." *George v. Kraft Foods Glob., Inc.*, 814 F. Supp. 2d 832, 852 (N.D. Ill. 2011) (citation omitted). Fiduciaries must act with the "care, skill, prudence, and diligence" that a "prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," 29 U.S.C. § 1104(a)(1)(B), and "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A). Defendants have breached their fiduciary duty of prudence by assembling a menu of PPO options where there is *no* financial benefit to selecting the Premier PPO option.

8.      Defendants are aware of the Premier PPO's dominated status. Among other things, after consulting with the Plan's actuaries, Northwestern University's benefits department has admitted that it is unlikely that there is a scenario where a participant would be financially better off with the Premier PPO option. Yet despite this admission, Defendants have taken no steps to remedy the problem.

9.      Defendants are duty bound to disclose this to the Plan's participants at large, as they possess "an affirmative obligation to communicate material facts affecting the interests of beneficiaries." *Anweiler v. Am. Elec. Power Serv. Corp.*, 3 F.3d 986, 991 (7th Cir. 1993) (citation omitted). But they have failed to do so, in breach of their fiduciary obligations to participants. On the contrary, Defendants suggest to the participants that the Premier PPO is the most financially advantageous option.

10.     Offering a financially dominated option like the Premier PPO imprudently shifts the burden from the employer to participants to determine the financial benefits of each option including the potentially dominated nature of the options—a task requiring a complicated mathematical computation to reveal. The consequences of this shift are material. In a 2017 study, researchers found that 61% of employees selected a financially dominated option when one existed.[6]

11.     The idea that individuals willingly enroll in a financially dominated option to achieve lower deductibles has been debunked, and a lack of insurance understanding is instead the overwhelming cause of this phenomenon. When the consequences of selecting a financially dominated option were shared with participants, researchers found this reduced the share of

---

[6] Choose to Lose: Health Plan Choices from Menu with Dominated Options, at 1321.

4

subjects choosing a dominated option to 18%.[7] When the focus was placed upon the enrollment decisions of individuals deemed to have a high understanding of insurance, it was found that less than 2% chose a dominated option.[8] This underscores the importance of offering prudent, non-dominated health insurance options to participants, and of disclosing the dominated nature of an option where one is offered. Defendants have failed to do either.

12.     Defendants' decision to offer the financially dominated Premier PPO option and the failure to disclose its dominated nature to participants has resulted in the Plan and its participants paying wholly excessive and unnecessary healthcare expenses in the form of lost wages due to excessive premiums unaccompanied by any reduced out-of-pocket expenses.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breaches of the fiduciary duties of prudence and loyalty. Plaintiffs also assert a claim against Defendant Northwestern University for its failure to monitor the fiduciaries it appointed to manage the Plan.

## JURISDICTION AND VENUE

14.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employer-sponsored health insurance plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

15.     This case presents a federal question under ERISA, and therefore the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

---

[7] Choose to Lose: Health Plan Choices from Menu with Dominated Options, at 1325.
[8] *Id.*

16.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the beaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### *Plaintiffs*

17.     Plaintiff Natalie Barbich resides in Chicago, Illinois. Plaintiff Barbich participated in the Northwestern University Employee Welfare Plan from approximately 2019 through 2022 and is a former participant in the Plan. During Plaintiff's time in the Plan, she was enrolled in "You" coverage through the Premier PPO option. Plaintiff has been financially injured by Defendants' unlawful conduct, and her compensation would have been higher if Defendants had not violated ERISA as described herein.

18.     Plaintiff Bruce Lindvall resides in Evanston, Illinois. Plaintiff Lindvall participated in the Northwestern University Employee Welfare Plan since it was established January 1, 2018, through approximately 2023 and is a former participant. Before the Plan was established, Plaintiff participated in one of Northwestern University's predecessor health plans, starting approximately in 2006. During Plaintiff's time in the Plan, he was enrolled in "You" coverage through the Premier PPO option. Plaintiff has been financially injured by Defendants' unlawful conduct, and his compensation would have been higher if Defendants had not violated ERISA as described herein.

### *Defendants*

19.     Defendant Northwestern University ("Northwestern") is a private research university primarily located in Evanston, Illinois.

20.     Northwestern is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). Northwestern has named the Executive Director, Benefits & Work/Life Resources (the "Executive

Director") as the "administrator" of the Plan within the meaning of 29 U.S.C. § 1002(16)(A). As the administrator of the Plan, the Executive Director exercises discretionary authority or control with respect to the administration of the Plan and management and disposition of Plan assets. The Executive Director is therefore a functional fiduciary under 29 U.S.C. § 1002(21)(A).

21. Northwestern may delegate its fiduciary responsibilities to any other person, persons, or entity. Any individuals or entities not named in this Complaint to whom Northwestern delegated fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and 1105(c)(2). Because any such individuals or entities that have been delegated fiduciary responsibilities are not currently known to Plaintiffs, they are collectively named in this Complaint as Does 1-20 and are included in all references to "Defendants" collectively.

*Northwestern University Employee Welfare Benefit Plan*

22. The Northwestern University Employee Welfare Benefit Plan was established January 1, 2018, and provides certain welfare and other benefits for eligible personnel and retirees of Northwestern University as part of their overall compensation. Included within these benefits are health insurance, dental insurance, life insurance, long-term disability insurance, vision insurance, business travel insurance, and an employee assistance program.

23. For their health insurance, Plan participants have a choice of a preferred provider organization plan with three different tiers or a health maintenance organization ("HMO") plan.

24. Premiums for coverage under any of the available health insurance options are deducted from participants' paychecks on a pre-tax basis. Premiums are deducted on either a bi-weekly or monthly basis, in accordance with the frequency of a participant's paycheck.

25. The three PPO tiers are Premier, the low-deductible option; Select, the mid-deductible option; and Value, the high-deductible option. If participants elect coverage through

the Value PPO option, they may choose to open and contribute to a Health Savings Account ("HSA"), to which Northwestern makes a dollar-for-dollar matching contribution each year and which may be used to pay the cost of qualified health care expenses as defined by the Internal Revenue Service.[9] Any balance remaining in a participant's HSA at the end of the year may be rolled over for future use.

26.     Critically, there is no difference in health-care coverage for participants in the Premier, Select, and Value PPO options. The only differences between the PPO options are the financial terms: premium amounts, coinsurance rates, copayments, maximum out-of-pocket expenses, and eligibility for HSA or FSA accounts. Participants in all three PPO options may choose to receive care from any licensed doctor, hospital, or facility, but will incur lower out-of-pocket expenses for "In-Network" services (that is, services performed by members of the Plan's BlueCross BlueShield of Illinois PPO provider network). Prior to January 1, 2025, participants received additional discounts beyond In-Network rates when receiving care from Northwestern Medicine physicians who are members of the Northwestern Medicine Network. However, Northwestern collapsed the Plan's Northwestern Medicine Network coverage into the In-Network coverage, effective January 1, 2025.[10]

27.     Regardless of which PPO option is selected, participants may choose between coverage tiers depending on the desired number of insured individuals. Participants may choose

_____

[9] Participants enrolled in the Premier and Select PPO options are ineligible for an HSA but may participate in a Flexible Spending Account ("FSA"). Northwestern offers no matching contributions to an FSA, and any unused participant contributions are forfeited at the end of each year. While Value PPO participants are ineligible to participate in a FSA, they may enroll in a Limited Use FSA. Until the Value PPO plan's annual deductible is met, the Limited Use FSA may only be applied toward eligible dental and vision care expenses.

[10] https://web.archive.org/web/20241114221611/https://hr.northwestern.edu/benefits/eligibility-changes/open-enrollment1/open-enrollment-faqs.html#medical

between You, You + Spouse/Partner, You + Child(ren), or You + Spouse/Partner + Child(ren) coverage tiers. The premiums paid by a participant are based on the coverage tier selected, employment status (whether the individual is full-time or part-time), and the participant's salary.

28.     The Plan is self-insured. This means it is funded by both employee and employer contributions that are deposited within a trust, pays claims and other expenses from the trust, and is exempt from state insurance regulations.

## **ERISA'S FIDUCIARY DUTIES**

29.     "ERISA protects employee pensions and other benefits . . . by setting forth certain general fiduciary duties applicable to the management of both pension and non-pension benefit plans." *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996) (citation omitted). In the ERISA context, the term "plan" means "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both[.]" 29 U.S.C. § 1002(3). An employee welfare benefit plan includes "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits[.]" 29 U.S.C. § 1002(1). To protect participants of employee benefit welfare plans like the Plan, 29 U.S.C. § 1104(a)(1) states, in relevant part:

[A] fiduciary shall discharge his duties with respect to a plan …

    (A)    for the exclusive purpose of

        (i)     providing benefits to participants and their beneficiaries; and

        . . . .

    (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

These fiduciary duties are "the highest known to the law." *Kraft Foods Glob., Inc.*, 814 F. Supp. 2d at 852.

## DUTY OF LOYALTY

30.    "The duty of loyalty is one of the common law trust principles that apply to ERISA fiduciaries, and it encompasses a duty to disclose." *King v. Blue Cross & Blue Shield of Illinois*, 861 F.3d 730, 744 (9th Cir. 2017). Indeed, "[t]he duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 466 (7th Cir. 2010) (citation omitted). Fiduciaries' duty to communicate material facts to participants "exists when a beneficiary asks fiduciaries for information, and even when he or she does not." *Anweiler*, 3 F.3d at 991 (citation omitted). A fiduciary must inform participants "when it knows that silence may be harmful and cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits." *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007); *see also* Restatement (Third) of Trusts § 82 cmt. d (outlining "an affirmative requirement that . . . the trustee inform fairly representative beneficiaries of important developments and information that appear reasonably necessary for the beneficiaries to be aware of in order to protect their interests.").

31.    This general fiduciary duty to disclose material information is supplemented by a specific statutory obligation to provide information in a form "sufficiently accurate and comprehensive to reasonably apprise [] participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a).

**DUTY OF PRUDENCE**

32.     "If there is . . . a 'hallmark' of a fiduciary activity identified in the statute, it is prudence." *Sweda v. Univ. of Penn.*, 923 F.3d 320, 333 (3d Cir. 2019). This is not a lay person standard, but instead "requires expertise in a variety of areas[.]" Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (Sept. 2017).[11] Because ERISA makes no distinction among types of employee benefit plans, this duty applies to all ERISA-covered plans. *See Varity Corp.*, 516 U.S. at 596. Indeed, "the fiduciary duty provisions of ERISA . . . apply with equal force to welfare and pension plans." *Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996). Thus, the duty of prudence includes "a continuing duty to monitor [benefit options] and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting [benefit options]." *Tibble v. Edison Intern.*, 575 U.S. 523, 529 (2015). If a benefit option is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* at 530 (quotation omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu" of benefit options or for failing to monitor the plan's benefit options to ensure that each remains prudent. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423-24 (4th Cir. 2007).

33.     It is no defense to the imprudence of some benefit options that others may have been prudent; a meaningful mix and range of options does not insulate plan fiduciaries from liability of breach of fiduciary duty. *See Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022) (*"Hughes I"*). "[T]he Seventh Circuit clarified that a pleading need not show that a prudent alternative was actually available; showing that an alternative prudent option was plausibly available sufficed."

---

[11] *Available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/
publications/meeting-your-fiduciary-responsibilities.pdf.

*Acosta v. Bd. of Trustees of Unite Here Health*, 2023 WL 2744556, at *4 (N.D. Ill. Mar. 31, 2023) (citing *Hughes v. Nw. Univ.*, 63 F.4th 615, 629-30 (7th Cir. 2023) (*"Hughes II"*)).

### FIDUCIARY VS. SETTLOR FUNCTIONS

34.     Whether these duties apply to the actions of the Plan sponsor and the Plan's fiduciaries hinges upon the distinction between fiduciary and settlor functions. Generally, the decision to adopt, modify, or terminate a welfare plan is a settlor decision outside the bounds of ERISA. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 79 (1995). However, activities undertaken to implement settlor decisions are fiduciary functions subject to ERISA. 29 U.S.C. § 1002(21)(A)(i), (iii) (ERISA defines a fiduciary as any person "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."); *see also* DOL Adv. Opinion No. 2001-01A, 2001 WL 125092, at *2 (Jan. 18, 2001) (finding that the implementation of a settlor decision is a fiduciary activity). Thus, although the decision to offer health insurance to plan participants may be a settlor decision, an employer's decision as to *which* specific health insurance options to offer is subject to ERISA's fiduciary duties as an implementation of a settlor decision.

### DEFENDANTS' VIOLATIONS OF ERISA

I.     **DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES IN MANAGING THE NORTHWESTERN UNIVERSITY EMPLOYEE WELFARE BENEFIT PLAN**

35.     As fiduciaries, Defendants are required to ensure that costs incurred by participants are reasonable. *See Sweda*, 923 F.3d at 328 ("Fiduciaries must . . . understand and monitor plan expenses."); *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (discussing

a fiduciary's duty to keep plan expenses under control); *see also* Restatement (Third) of Trusts §

90, cmt. A ("Implicit in a trustee's fiduciary duties is a duty to be cost-conscious."). "Wasting

beneficiaries' money is imprudent." *Hughes II*, 63 F.4th at 627 (internal quotation marks omitted).

When selecting health insurance options for participants, "the responsible plan fiduciary must

engage in an objective process designed to elicit information necessary to assess . . . the

reasonableness of the fees charged in light of the services provided." DOL Info. Letter from Bette

J. Briggs to Diana O. Ceresi, 1998 WL 1638068, at *1 (Feb. 19, 1998).

36.     Defendants are additionally duty bound to disclose material information to Plan

participants. "Information is material if there is a substantial likelihood that nondisclosure 'would

mislead a reasonable employee in the process of making an adequately informed decision

regarding benefits to which she might be entitled.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d

585, 599 (8th Cir. 2009) (quoting *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639,

644 (8th Cir. 2007)).

37.     Despite these duties, Defendants failed to undertake the requisite prudent process

in assessing the fees, in the form of premiums deducted from participants' paychecks, within the

Premier PPO option in light of the services provided. Instead, the more costly Premier PPO option

offered to participants gives them access to the same suite of services with *no* financial or medical

benefit to participants when compared to the Value PPO option. This is true regardless of a full-

time participant's coverage level (i.e., whether they are insuring themselves, themselves and their

spouse or partner, or themselves, their spouse or partner, and their children), salary level, and

amount of medical services received.

38.     Despite this fact, Defendants misleadingly inform participants that "[i]f you choose

a plan with lower monthly Premiums [the Value PPO option], you will likely pay more in out-of-

pocket costs – through Copayments, Coinsurance, Deductibles, and the like – than you would if you choose a plan with higher monthly Premiums [the Premier PPO option]."[12]

39.     To illustrate, for individuals selecting "You" coverage through the Premier PPO option, annual premiums range from $3,528 to $7,812 depending upon their salary, while their In-Network deductible is $500 with an out-of-pocket maximum of $2,400. In contrast, individuals selecting "You" coverage instead through the Value PPO option would incur annual premiums between $264 and $3,048 with a $2,100 In-Network deductible and $3,000 out-of-pocket maximum. In other words, an individual enrolled in the Premier PPO option will pay between $3,264 and $4,764 *more* in premium payments than if they had enrolled in the Value PPO option, while reducing their total out-of-pocket maximum by only $600. The Premier PPO premiums exceed the reduction in out-of-pocket maximum for all salary and coverage levels, as summarized in the following table:

| Differences in Premier PPO & Value PPO Premiums and Out of Pocket Maximums | | | | | | |
|---|---|---|---|---|---|---|
| Coverage Level | Difference in Premier vs. Value Annual Premium – Low Salary | Difference in Premier vs. Value Annual Premium – Mid Salary | Difference in Premier vs. Value Annual Premium – High Salary | Premier Out-of-Pocket Maximum | Value Out-of-Pocket Maximum | Difference in Premier vs. Value Out-of-Pocket Maximum |
| You | $3,264 | $3,780 | $4,764 | $2,400 | $3,000 | -$600 |
| You + Spouse | $7,308 | $8,580 | $10,824 | $6,600 | $8,000 | -$1,400 |
| You + Child(ren) | $6,000 | $7,128 | $8,964 | $6,600 | $8,000 | -$1,400 |
| You + Spouse + Child(ren) | $11,052 | $12,900 | $16,296 | $6,600 | $8,000 | -$1,400 |

---

[12] Plan's Summary Plan Description.

14

40. The financially dominated nature of the Premier PPO option stems from the varying premiums, deductibles, coinsurance rates, and out-of-pocket maximums between the PPO options. Premium amounts increase given a participant's salary level, with the Premier PPO option having the highest premiums and the Value PPO option having the lowest. Premiums additionally increase within each PPO option as more individuals are covered.

41. The Premier PPO's financially dominated status was confirmed by Defendants in an email to a Northwestern University faculty member. After consulting with Northwestern's actuaries, a representative from its benefits department explained that the actuaries "concurred that it is unlikely that there is a scenario where one would be financially better off with the Premier PPO, given the employee contributions relative to the out of pocket maximum." This holds true at every level of medical spending, whether In-Network or Out-of-Network.[13] It is also nearly certain that the Premier PPO option is financially dominated by the Select PPO, or mid-deductible, option. This also holds true at every level of medical spending whether In-Network or Out-of-Network.[14]

42. For an example of how the Value PPO option dominates the Premier PPO option, a participant who falls in the highest salary bracket for premiums, enrolls in "You + Spouse + Children" coverage, and seeks medical care through in In-Network services would spend more on their and their family's healthcare by choosing the Premier PPO than choosing the Value PPO

---

[13] Under only extreme conditions is it possible for the out-of-pocket spend for the Value PPO option to exceed that of the Premier PPO option. Specifically, individuals would have to fall within the low- or mid-salary premiums, enroll in the You + Children coverage level, and incur *out-of-network* medical expenses that exceed approximately $40,000. This is likely why the Northwestern benefits department deemed it "unlikely" but not "impossible" that an individual would be financially better off in the Premier PPO option.

[14] Unlike the Value PPO option, the Select PPO option does not have a uniform coinsurance rate among medical services received but instead additionally incorporates copays. The presence of copays within the Select PPO option lead Plaintiffs to believe with near but not complete certainty that the Select PPO option financially dominates the Premier PPO option.

option. This is true regardless of whether the participant and their family have no medical bills, a moderate amount of medical bills, or reach their out-of-pocket maximum, as shown here:[15]



43.     These results are further emphasized when considering the presence of health savings account for those within the Value PPO option. For participants selecting "You" Value PPO coverage, Northwestern makes a dollar-for-dollar matching contribution of up to $1,000 annually. For participants selecting all other levels of Value PPO coverage, Northwestern matches up to $2,000 annually. These matching contributions effectively lower the Value PPO's deductible and widen the out-of-pocket maximum gap in comparison to the Premier PPO option.

---

[15] The graph only includes premiums, deductibles, coinsurance, and out-of-pocket maximums. It is not possible for the graph to include copays, which depend on the number of office visits.

44.     Offering PPO options to participants in which no single option is financially dominated was a plausibly available prudent alternative for Defendants, as approximately half of firms succeed in offering non-dominated options.[16] Yet when pressed to justify the decision to offer a financially dominated option, the benefits department concluded that "choice has always been important to our faculty and staff, even with higher employee contributions." But the Supreme Court has held that "participants' ultimate choice" cannot "excuse allegedly imprudent decisions by [Defendants]." *Hughes*, 142 S. Ct. at 742. By continuing to offer the Premier PPO option in light of its dominated nature while additionally *acknowledging* that it provides no additional benefits to participants despite its high premiums, Defendants have breached their fiduciary duty of prudence.

45.     Further, by failing to communicate to Plan participants that enrolling in the Premier PPO option results in the highest payroll deduction for premiums while providing no additional financial benefit over the lower premium options, Defendants failed to disclose material information in breach of their duties under ERISA.

## CLASS ACTION ALLEGATIONS

46.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to seek the remedies provided by 29 U.S.C. § 1109(a). In addition, 29 U.S.C. § 1132(a)(3) authorizes any participant or beneficiary to bring suit for injunctive or other equitable relief. Plaintiffs seek certification of this action as a class action pursuant to these statutory provisions and Fed. R. Civ. P. 23.

---

[16] How Common are Dominated Health Options? Evidence from Employer Health Benefits with High-Deductible Plans, at 30.

17

47.     Plaintiffs assert their claims against Defendants on behalf of a class of participants and beneficiaries of the Plan defined as follows:[17]

> All full-time employee participants and beneficiaries of the Northwestern University Employee Welfare Plan enrolled in the Premier preferred provider organization option at any time on or after June 20, 2019, excluding Defendants, any of their directors, and any officers or employees of Defendants with responsibility for the Plan's administrative functions.

48.     <u>Numerosity</u>:   The Class is so numerous that joinder of all Class members is impracticable. The Plan has thousands of participants.

49.     <u>Typicality</u>:     Plaintiffs' claims are typical of the Class members' claims. Plaintiffs participated in the Plan, were full-time employees of Northwestern University, enrolled in the Premier preferred provider organization option, and were subject to the same preferred provider organization options as other Class members. Defendants managed the Plan collectively and treated Plaintiffs consistently with other Class members. Defendants' imprudent actions and omissions affected all class members similarly.

50.     <u>Adequacy</u>:     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

51.     <u>Commonality</u>:  Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

---

[17] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

a. Whether Defendants are fiduciaries of the Plan, and the scope of their fiduciary duties;

b. Whether the Plan's fiduciaries breached their duties under ERISA by engaging in the conduct described herein;

c. The proper form of equitable and injunctive relief; and

d. The proper measure of monetary relief.

52.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

53.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as replacement of the Plan's preferred provider organization options or removal of Plan fiduciaries, would be dispositive of non-party participants' interests.

54.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual

19

basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Fiduciary Duty**
**Offering a Dominated Option**

55.     Plaintiffs repeat and re-allege Paragraphs 1 through 54 of the Complaint as though fully set forth herein.

56.     Defendants are or were fiduciaries of the Plan under 29 U.S.C. § 1002(21).

57.     29 U.S.C. § 1104 imposes fiduciary duties of loyalty and prudence upon Defendants in connection with the administration of the Plan and the selection and monitoring of the Plan's preferred provider organization options.

58.     The scope of this fiduciary duty includes managing the Plan solely in the interest of its participants and beneficiaries and with appropriate care, skill, diligence, and prudence. Defendants are directly responsible for ensuring that each PPO option within the Plan is reasonable, evaluating and monitoring the Plan's PPO options on an ongoing basis, and removing imprudent ones.

59.     Defendants breached their fiduciary duties by offering a menu of preferred provider organization options to Plan participants in which the Premier PPO option offered no financial or medical benefit to its enrollees when compared to the Select and Value PPO options. A prudent fiduciary would have monitored premiums, deductibles, coinsurance rates, and out-of-pocket maximums of the various PPO options to ensure that no option was financially dominated by any

other option. Defendants failed to take these prudent measures to monitor the Plan's PPO options to ensure that enrollees in the Premier PPO option received a financial benefit and therefore breached their duty of prudence to the Plan.

60.     Defendants' fiduciary breach resulted in significant losses to the Plan and its participants in the form of excessive healthcare expenses, including through payroll deductions and lost wages. Each Defendant is liable for the losses that resulted from these fiduciary breaches, as well as equitable relief and other relief as provided by ERISA. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

**COUNT II**
**Breach of Fiduciary Duty**
**Failure to Provide Material Facts**

61.     Plaintiffs repeat and re-allege Paragraphs 1 through 60 of the Complaint as though fully set forth herein.

62.     Defendants are or were fiduciaries of the Plan under 29 U.S.C. §§ 1002(21). Their fiduciary obligations require the communication of material facts to participants when it is known that Defendants' silence may be harmful to participants, whether or not the participant asks for this material information.

63.     Defendants breached their fiduciary duty by failing to communicate and disclose to participants that the Premier PPO option provides no financial benefit to participants in comparison to the Select and Value PPO options despite having knowledge of this material fact.

64.     Defendants' fiduciary breach resulted in significant losses to the Plan and its participants in the form of excessive healthcare expenses, including through payroll deductions and lost wages. Each Defendant is liable for the losses that resulted from these fiduciary breaches,

as well as equitable relief and other relief as provided by ERISA. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

## COUNT III
### Failure to Monitor Fiduciaries

65.     The Executive Director, Benefits & Work/Life Resources is a fiduciary of the Plan with responsibilities relating to the selection and monitoring of the Plan's PPO options.

66.     Northwestern University is responsible for appointing and removing the Executive Director as a plan fiduciary. Northwestern may additionally delegate its fiduciary responsibilities to any other person, persons, or entity. Northwestern therefore has a fiduciary responsibility to monitor the performance of the Executive Director and any other person, persons, or entity not named in the Complaint to whom Northwestern has delegated such fiduciary responsibilities.

67.     A monitoring fiduciary must ensure that its appointed fiduciaries are performing their fiduciary obligations, including those with respect to the administration of the Plan, and must take prompt and effective action to protect the Plan and its participants when they fail to perform their fiduciary obligations in accordance with ERISA.

68.     Northwestern University breached its fiduciary monitoring duties by, among other things:

    a.  Failing to monitor and evaluate the performance of the Executive Director and any other delegated fiduciaries not named in the Complaint or have a system in place for doing so, standing idly as Class members incurred significant losses as a result of the imprudent actions and omissions of the Executive Director and any other delegated fiduciaries not named in the Complaint;

    b.  Failing to monitor the processes by which the Plan's preferred provider organization options were selected, monitored, and retained, which would have alerted a prudent fiduciary to the breaches of fiduciary duties outlined above;

    c.  Failing to monitor the processes or systems of communication by which the Executive Director and any other delegated fiduciaries not named in the

Complaint used, or failed to use, to convey material facts to Plan participants; and

d. Failing to remove the Executive Director or other any other delegated fiduciaries not named in the Complaint whose performance was inadequate in that they selected and retained imprudent preferred provider options for the Plan, all to the detriment of the Plan and its participants.

69. As a consequence of the foregoing breaches of the duty to monitor, Plan participants suffered millions of dollars in lost wages by way of excessive premiums that provided no additional financial or medical benefit.

70. Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Northwestern University is liable to restore to the Plan and its participants all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor its appointed fiduciaries to the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representative and designation of Plaintiffs' counsel as Class Counsel;

C. A declaration that Defendants have breached their fiduciary duties under ERISA;

D. An order compelling Defendants to personally make good to the Plan and its participants all losses incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to their position but for this unlawful conduct;

E. Surcharge and other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

F.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

G.      An award of pre-judgment interest;

H.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

I.      An award of such other and further relief as the Court deems equitable and just.


Dated: June 20, 2025

**THE PRINZ LAW FIRM, P.C.**
s/ Amit Bindra
Amit Bindra, IL Bar No. 6308593
1 East Upper Wacker Drive, Suite 2500
Chicago, IL 60601
Telephone: (312) 212-4450
Facsimile: (312) 284-4822
abindra@prinz-lawfirm.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN Bar No. 22084X*
    *Admitted in N.D. Ill.*
Brock J. Specht, MN Bar No. 0388343**
Ben Bauer, MN Bar No. 0398853**
    ** *pro hac vice application forthcoming*
4700 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
lukas@nka.com
bpsecht@nka.com
bbauer@nka.com

**DON BIVENS, PLLC**
Don Bivens, AZ Bar No. 005134
    * *pro hac vice application forthcoming*
15169 N. Scottsdale Road, Suite 205
Scottsdale, Arizona 85254
Telephone: (602) 762-2661

ATTORNEYS FOR PLAINTIFFS